UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUANA DEL CARMEN GOMEZ,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:17-cv-01035-JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JUANA DEL CARMEN GOMEZ AND AGAINST DEFENDANT NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Juana Del Carmen Gomez asserts she is entitled to benefits under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the record and seeks judicial review of the decision to deny her application for benefits. Because the ALJ failed to apply the proper legal standards in evaluating the record, the decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**PROCEDURAL HISTORY**

Plaintiff alleged disability beginning January 1, 2010, in her applications for a period of disability, disability insurance benefits, and supplemental security income. (Doc. 13-3 at 30.) After the Social Security Administration denied the applications at the initial level and upon reconsideration, Plaintiff requested a hearing, which was held on April 14, 2016. (*See generally* Doc. 13-4; *see also* Doc. 13-3 at 31.) The ALJ determined Plaintiff was not disabled and issued an order denying benefits on May 9, 2016. (Doc. 13-3 at 31-39.) When the Appeals Council denied Plaintiff's request for review

1

on January 17, 2018 (Doc. 13-3 at 8-11), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## **STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## **DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.    Relevant Medical Background and Opinions**

On January 21, 2009, Plaintiff was taken to emergency department by ambulance after she tripped over a parking block and fell, "landing on her face." (Doc. 13-9 at 32, 34.) Dr. Ronald Peterson determined Plaintiff exhibited "[s]ome mild tenderness to palpation in the right upper portion of the neck, some stiffness to movement." (*Id.* at 32) Dr. Jeffrey Butler, D.O., determined x-rays of the cervical spine showed "a widening of the vertebral process between C1-C2 with degenerative changes at C3-C4." (*Id.* at 35.) An MRI was also performed, which showed "no ligamentous injury [and] mild subluxation at C4-C5 due to asymmetric left facet degenerative hypertrophy." (*Id.*)

On June 20, 2011, Plaintiff was seen by Dr. Jim C. Kim, a rheumatologist. (Doc. 13-10 at 2.) Plaintiff complained of fatigue and severe pain in her "shoulders, knees, ankles, feet, hands, wrist, [and] legs." (*Id.*) She told Dr. Kim that her symptoms began two months prior, and aggravating factors included cold and activity. (*Id.*) Dr. Kim diagnosed Plaintiff with inflammatory arthritis, polyarthralgia, and fatigue. (*Id.*) She was given a prescription for Sulfazine and a renewed prescription for Tramadol. (*Id.*)

The following month, Plaintiff continued to describe having "pain all over" to Dr. Kim. (Doc. 13-10 at 4.) She described the pain as severe and constant, in her "shoulders, joints, legs, [and] hands." (*Id.*) Dr. Kim indicated Plaintiff had "mild improvement" with Sulfazine, and he prescribed a trial of Methylprednisolone. (*Id.*) He also determined Plaintiff had a Vitamin D deficiency, and recommended Plaintiff increase her Calcium and Vitamin D intake. (*Id.*)

On September 26, 2011, Plaintiff was seen by Dr. Kim, and she continued to complain of severe pain to the neck, shoulders, arms and legs occurring daily. (Doc. 13-10 at 6.) Plaintiff was assessed with unspecified inflammatory polyarthropathy, Vitamin D deficiency, joint pain, and fatigue/malaise. (*Id.*) Dr. Kim indicated he spent "[e]xtensive time … counseling the patient regarding the differential diagnosis, prognosis, treatment options, risks, and benefits." (*Id.*) Plaintiff was continued on Sulfazine and Methylprednisone. (*Id.*)

In November 2011, Plaintiff described her pain as "moderate" to Dr. Kim. (Doc. 13-10 at 7.) Plaintiff said her "symptoms [had] worsened." (*Id.*) Dr. Kim administered injections of Vitamin B12 and Methylprednisone. (*Id.*)

Plaintiff told Dr. Kim that her symptoms had "improved" in March 2012. (Doc. 13-10 at 8.) She continued to report "pain all over and fatigue." (*Id.*) Dr. Kim again recommended Plaintiff increase her Calcium and Vitamin D intake, and indicated she should increase "weight bearing activity." (*Id.*) He did not administer another injection of Methylprednisone. (*Id.*)

In June 2012, Plaintiff reported that she continued to have fatigue, and pain in her "back and bilateral legs." (Doc. 13-10 at 9.) Dr. Kim ordered new x-rays of Plaintiff's knees, ankles, and feet. (*Id.*; Doc. 13-10 at 11-15.) The imagining in Plaintiff's knees were negative for any findings. (Doc. 13-10 at 11.) She had a "[s]mall plantar calcaneal spur" in the left foot and a "[m]inimal plantar calcaneal spur" in the right foot. (*Id.* at 12-13, 15.)

In October 2012, Plaintiff reported her "symptoms [had] worsened," and she felt pain "everywhere." (Doc. 13-10 at 11.) Dr. Kim prescribed Hydroxychloroquine (Paquenil) to Plaintiff, and directed her to return the following month. (*Id.*)

On November 8, 2012, Dr. Kim saw Plaintiff for the same complaints. (Doc. 13-10 at 13.) Plaintiff again said her pain had worsened. (*Id.*) Plaintiff was continued on Sulfazine and Plaquenil, and Dr. Kim added Methotrexate with Folic Acid to the prescription. (*Id.*)

Later that month, Plaintiff visited an emergency room for "chest pain that [was] sharp and stabbing in character." (Doc. 13-9 at 28.) Dr. Thomas Reilly opined Plaintiff's lungs were "clear to auscultation," and her breathing sounds were equal. (*Id.* at 29) According to Dr. Reilly, Plaintiff had a normal range of motion, "normal strength, no tenderness, no swelling, [and] no deformity" in her

musculoskeletal exam. (*Id.*)

Plaintiff followed up with Dr. Kim on December 21, 2012, complaining of the same symptoms, which she reported as moderate to severe, occurring constantly, and remaining unchanged. (Doc. 13-10 at 15.) Plaintiff was continued on Sulfazine, Plaquenil, and Methotrexate. (*Id.*)

On December 29, 2012, Plaintiff saw a podiatrist, Dr. Brandon Hawkins, who noted a "severe history of osteoarthritis and rheumatoid arthritis." (Doc. 13-19 at 48.) Dr. Hawkins noted Plaintiff exhibited "slightly diminished" sharp and dull sensations. (*Id.*) He noted:

> Musculoskeletal [examination] at this time shows a small lateral deviation of hallux at the dorsum and medical prominence bilateral. There is a lot of deviation of the digits two through five with the dorsally contracted PIP joints as well as pain on palpation. There is also noted at this time plantar flex metatarsals two through give bilateral with some atrophy of the skin and the plantar fat-pad.

(*Id.*) Dr. Hawkins diagnosed Plaintiff with "[s]evere painful osteoarthritis with rheumatoid arthritis," equinus deformity, plantar flex metatarsals, tendonitis, and pain and difficulty in ambulation. (*Id.* at 49.) Custom orthotic shoe inserts were ordered, and Plaintiff was prescribed Ultram to aid with neuropathy. (*Id.*)

In February 2013, Plaintiff described her pain as a "9" to Dr. Kim, and stated her symptoms were "stable." (Doc. 13-10 at 17.) Dr. Kim noted Plaintiff had taken Niacin for her cholesterol, but it caused her body to flush and Plaintiff went to the emergency room for treatment. (*Id.*)

On March 5, 2013, Plaintiff was seen by Dr. Kim for follow-up of the same complaints of pain and fatigue. (Doc. 13-10 at 19.) Symptoms were reported as moderate, constant, and unchanged. (*Id.*) She was again assessed with unspecified inflammatory polyarthropathy, Vitamin D deficiency, chronic joint pain, and fatigue/malaise. (*Id.*) Plaintiff was continued on Sulfazine and Plaquenil, and the dosage of Methotrexate was increased. (*Id.*)

In July 2013, Plaintiff visited an emergency room, describing "intermittent left-sided chest pain, radiating to the left upper extremity for the past month." (Doc. 13-9 at 12.) She also reported feeling "shortness of breath, dizziness, lightheadedness, nausea, vomiting, and diaphonesis." (*Id.*) Upon examination, Dr. Henein opined Plaintiff did not exhibit shortness of breath and she had a normal range of motion. (*Id.* at 12-13.) She was diagnosed with a diagnosis of "[a]cute chest pain." (*Id.* at 17.)

Dr. Kim saw Plaintiff on August 13, 2013, at which time Plaintiff described her symptoms were

"unstable" and occurring constantly. (Doc. 13-10 at 21.) The doctor continued Plaintiff's prescriptions for Sulfazine and Plaquenil, and increased the dosage of Methotrexate. (*Id.*)

On November 14, 2013, Plaintiff continued to report having pain in her hands, fingers, wrists, elbows, hips, ankles, back, and neck. (Doc. 13-10 at 23.) Dr. Kim noted Plaintiff had not been taking Methotrexate and indicated the prescription would "restart." (*Id.*) Dr. Kim indicated Plaintiff verbalized understanding the "proper way to take meds" through the assistance of an interpreter. (*Id.*) He ordered imaging of Plaintiff's hips, pelvis, and lumbar spine. (*Id.* at 24.)

Dr. Kim completed a residual functional capacity questionnaire on November 21, 2013. (Doc. 13-13 at 32-35.) He noted his first patient contact with Plaintiff occurred in 2009, and he treated Plaintiff every few months for inflammatory arthritis. (*Id.* at 32.) Dr. Kim noted Plaintiff's symptoms included "joint pain," which was characterized as "quite severe," and "10/10." (*Id.*) Dr. Kim stated his diagnosis and prognosis were supported by Plaintiff's elevated sedimentation rate of 45 and C-reactive protein (CRP) of 8.9. (*Id.*) He stated medication side effects of fatigue may affect Plaintiff's ability to sustain work. (*Id.*) He opined Plaintiff's prognosis was fair, and noted that the impairments lasted or would be expected to last over 12 months. (*Id.* at 32-33.) Dr. Kim concluded that pain or symptoms would "frequently" interfere with Plaintiff's ability to sustain the attention and concentration necessary to sustain simple, repetitive work tasks in in a typical 8-hour workday. (*Id.*) He found Plaintiff was capable of "low stress" work. (*Id.*) According to Dr. Kim, Plaintiff could not sit more than 30 minutes at any one time, or stand longer than 15 minutes without needing to sit, walk or lie down. (*Id.* at 33-34.) He further opined Plaintiff could not sit or stand/walk for more than 2 hours out of an 8-hour workday. (*Id.* at 34.) Dr. Kim stated Plaintiff would require two 15-minute breaks in a 2-hour period. (*Id.*) Dr. Kim indicated Plaintiff could lift and carry 10 pounds occasionally and 20 pounds rarely; occasionally twist, stoop, or bend; rarely crouch or climb stairs; and never climb ladders. (*Id.*) Dr. Kim also opined Plaintiff had "limitations in doing repetitive reaching, handling, or fingering," which he attributed to arthritis. (*Id.*)

Dr. Emanuel Dozier performed a comprehensive internal medicine evaluation on January 31, 2014. (Doc. 13-15 at 10-14) Plaintiff's chief complaints were asthma and arthritis. (*Id.* at 10.) No medical records were available for Dr. Dozier's review, except a progress note dated February 12,

2013, when Plaintiff was seen following a colonoscopy. (*Id.*) Dr. Dozier noted Plaintiff reported "an 8-year history of bronchial asthma with coughing, wheezing, and shortness of breath." (*Id.*) He further noted Plaintiff had "a history of arthritis for the past 6 years involving [her] hands, wrists, elbows, shoulders, neck, back, hips, knees, ankles, and feet." (*Id.*) Plaintiff told Dr. Dozier her symptoms included swelling in the hands and knees; morning stiffness; and joints popping, locking, and buckling. (*Id.*) She also reported "[l]imitations on standing up to 20 minutes, walking to half a block and lifting to a gallon of milk." (*Id.*) Plaintiff described her pain as "a constant 9/10… for which she [took] medicine and [got] poor relief." (*id.*)

Dr. Dozier observed Plaintiff walking, and opined there were "no signs of pain, ataxia or shortness of breath." (Doc. 13-15 at 11.) He noted Plaintiff had "a normal steppage gait," sat "without discomfort," and was "able to transfer on and off the examination table without assistance." (*Id.*) He determined Plaintiff's motor strength was "5/5" in her arms and legs, and her grip strength was "4/5 bilaterally." (*Id.* at 13.) Dr. Dozier found Plaintiff's reflexes were "2+ and symmetric for the brachial radialis, triceps, and patellar," and the reflexes in her ankles were 1+. (*Id.*) Dr. Dozier concluded Plaintiff had an "unlimited" ability to sit, stand, and walk in an eight-hour day. (*Id.*) He opined Plaintiff did not have any restrictions with lifting, carrying, or manipulation. (*Id.*) He indicated Plaintiff had environmental limitations with "[t]emperature extremes, heat, cold, dust and fumes." (*Id.*)

Dr. Clarence Ballard reviewed Plaintiff's available medical records and completed a physical residual functional capacity assessment on February 19, 2014. (Doc. 13-4 at 9-13.) Dr. Ballard found Plaintiff could occasionally lift and carry up to 50 pounds, frequently lift and carry up to 20 pounds, stand or walk about 6 hours in an 8-hour workday, and sit about 6 hours in an 8-hour workday. (*Id.* at11.) He opined Plaintiff did not have postural, manipulative, visual or communicative limitations. (*Id.*) Dr. Ballard identified environmental limitations due to Plaintiff's history of "inflammatory of arthropathy" and mild asthma, and opined Plaintiff should "[a]void concentrated exposure" to extreme cold, extreme heat, humidity, fumes, odors, dust, gases and poor ventilation. (Doc. 13-4 at 11-12.)

Dr. L. Bobba, determined Plaintiff was not disabled at the agency reconsideration level on July 8, 2014. (Doc. 13-4 at 36.) Dr. Bobba noted Plaintiff's asthma was "controlled [with] inhalers" and her rheumatoid arthritis was "stable on meds." (*Id.*) She also noted Plaintiff had effort-dependent limited

7

range of motion of the lumbar spine, a normal gait, and no tenderness. (*Id.*) Dr. Bobba concluded Plaintiff was capable of medium work with environmental limits. (*Id.*)

Dr. Kim continued to treat Plaintiff. On October 23, 2014, Plaintiff reported her symptoms as being severe and occurring constantly. (Doc. 13-18 at 23.) Dr. Kim assessed her as having chronic joint pain, chronic unspecified Vitamin D deficiency, and chronic fatigue/malaise. (*Id.* at 25.) He continued her on Sulfazine and Plaquenil, and increased the dosage of Methotrexate. (*Id.*) Plaintiff underwent an MRI of her right knee taken the same month, which showed "focal chondral fissuring of the medial patellar facet" and "[p]osteromedial bursitis with ganglionic cyst formation that appear[ed] to extend intracapsularly with a small intraossesous extension into the posteromedial tibial plateau." (*Id.* at 21.)

In January 2015, Plaintiff told Dr. Kim that she continued to have pain and fatigue. (Doc. 13-8 at 18.) She described her symptoms as "mild" and indicated "[a]ggravating factors include[d] cold and weather." (*Id.*) Plaintiff reported back pain, joint pain, joint swelling, and morning stiffness. (*Id.* at 19.) Dr. Kim decreased Plaintiff's prescription for Methotrexate due to elevated liver function levels and prescribed Gabapentin "for neuropathy type symptoms" in Plaintiff's hands and feet. (*Id.* at 20.) In addition, Dr. Kim noted Plaintiff was "having more difficulty walking" and recommended "a cane for improved safety." (*Id.* at 21.)

In April 2015, Plaintiff continued to report fatigue and "severe" pain that occurred everywhere. (Doc. 13-18 at 13.) Dr. Kim noted Plaintiff had a "[l]oss of balance," ankle swelling, back pain, joint pain, joint swelling, and neck pain. (*Id.* at 14.)

On August 4, 2015, Plaintiff saw Dr. Kim for complaints of pain in her right arm. (Doc. 13-18 at 8.) Dr. Kim noted Plaintiff had negative findings for several systems, such as her respiratory, cardio, and psych systems. (*Id.* at 9.) However, Plaintiff had positive musculoskeletal results due to ankle swelling, joint pain, joint swelling, and muscle weakness. (*Id.*)

The same date, Dr. Kim completed a second physical residual functional capacity questionnaire. (Doc. 13-15 at 16-19.) Dr. Kim noted he first treated Plaintiff "prior to 2011," and saw her "every several months." (*Id.* at 16.) He noted that Plaintiff suffered from inflammatory arthritis and opined her prognosis was good. (*Id.*) According to Dr. Kim, Plaintiff's symptoms included joint pain and that her medication caused fatigue. (*Id.*) Dr. Kim indicated Plaintiff's diagnosis and prognosis were supported

by high G-couple protein receptors (GPR) and C-reactive protein (CRP). (*Id.*) He determined Plaintiff would occasionally have pain severe enough in a typical 8-hour workday that her attention and concentration necessary for simple, repetitive work tasks would be affected. (*Id.* at 17.) He opined she was capable of "low stress" work. (*Id.*) Dr. Kim indicated Plaintiff could not sit for longer than 30 minutes at one time, and longer than 4 hours out of 8. (*Id.* at 18.) He also opined she could not stand for longer than 15 minutes at one time or longer than 2 hours out of 8 hours. (*Id.*) Dr. Kim found Plaintiff could frequently lift objects under 10 pounds but never objects over 50 pounds. (*Id.*) He concluded Plaintiff had mild reaching, handling and fingering limitations. (*Id.*) Dr. Kim opined Plaintiff was likely to miss about three days per month due to her symptoms or due to necessary medical treatment. (*Id.* at 19.)

In November 2015, Dr. Kim noted Plaintiff described her pain as "moderate" and occurring on a daily basis. (Doc. 13-18 at 3.) She stated that aggravating factors for her pain included "activity and cold," while medication was a relieving factor. (*Id.*) Plaintiff had a positive musculoskeletal examination due to ankle swelling, back pain, joint pain, joint swelling, and muscle weakness. (*Id.* at 4.) In addition, Plaintiff reported neurological and psychological symptoms, such as difficulty sleeping and headaches. (*Id.* at 4.)

**B.    Administrative Hearing Testimony**

With the aid of a Spanish interpreter, Plaintiff testified at a hearing before the ALJ on April 14, 2016. (Doc. 13-3 at 48-59.) Plaintiff testified she could not work because of "various sicknesses," including arthritis and asthma. (*Id.* at 50-51.) She stated she had pain in her knees, arms, and back, which she described as a "nine" on a scale of zero to ten. (*Id.* at 51-52.) Plaintiff said she took Tramadol or Tylenol, which reduced her pain to a "seven" on the pain scale, but only for a half an hour. (*Id.* at 52.) She also said the pills made her sleep for approximately 2 hours during the day. (*Id.*)

Plaintiff said she was unable to sit for longer than a half hour because of her right knee. (Doc. 13-3 at 52.) She believed she could only stand or walk for "[o]nly ten minutes" before she needed to sit. (*Id.* at 53.) She stated that whenever walking, she used a cane that was prescribed by Dr. Jim Kim due to her foot pain. (*Id.* at 54.) Plaintiff testified she could carry up to five pounds comfortably, and could not lift more "due to the arthritis." (*Id.* at 53.)

9

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of January 1, 2010. (Doc. 13-3 at 33.) At step two, the ALJ found Plaintiff's severe impairments included: rheumatoid arthritis and osteoarthritis, right knee chondral fissuring, and obesity. (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled one of the listed impairments. (*Id.* at 34.)

Next, the ALJ determined: "[T]he claimant has the residual functional capacity to perform a range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c). The claimant must avoid concentrated exposure to temperature extremes, fumes, and odors." (Doc. 13-3 at 34.) Based upon this RFC, the ALJ opined at step four that Plaintiff was "capable of performing past relevant work as a cook" since "[t]his work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (*Id.* at 39.) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

## **DISCUSSION AND ANALYSIS**

Plaintiff asserts the ALJ erred in properly evaluating the medical evidence, in particular, the opinion of her treating physician, Dr. Kim. (Doc. 20 at 14-18.) Plaintiff further asserts that the ALJ failed to properly assess the credibility of her testimony. (*Id.* at 18-26.) On the other hand, Defendant argues that the ALJ properly considered the medical opinion of Dr. Kim and properly evaluated Plaintiff's subjective allegations. (Doc. 26 at 3-8.)

### A.   ALJ's Evaluation of the Medical Evidence

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). Generally, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.

1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, the courts apply a hierarchy to the opinions offered by physicians.

A treating physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

Plaintiff contends the ALJ erred in rejecting the medical opinion offered by treating physician Dr. Kim. Because Drs. Dozier, Ballard, and Bobba's opinions conflicted with limitations identified by Dr. Kim, the ALJ was required to set forth specific and legitimate reasons to support her rejection of Dr. Kim's opinion. *See Lester*, 81 F.3d at 830.

1.  Weight given to the physicians' opinions

Examining the medical evidence, the ALJ explained the weight given to the opinions of the doctors as follows:

> As for opinion evidence, State agency doctors [Ballard and Bobba] opined the claimant could perform a range of medium work with environmental precautions, i.e. avoid concentrated exposure to temperatures, humidity, and respiratory irritants (Exs. 3A, 4A-6A.) I accord these opinions significant weight because the opinions placing the claimant at medium level work with environmental precautions stated in the residential functional capacity is consistent with the medical evidence of record. For example, the consultative exam produced grossly normal findings. (Ex. 7F.)
>
> Dr. Dozier opined that the claimant only had environmental limits and should avoid temperature extremes, heat, cold, dust, and fumes. (Ex. 7F.) I accord great weight to this assessment because it was consistent with Dr. Dozier's lack of findings upon exam. However, the State agency assessments are given the most weight because their longitudinal perspective of the evidence since the alleged onset date is more accurately reflected in a medium residual functional capacity.
>
> On August 4, 2011, Jim Kim, MD, opined the claimant could perform less than

> sedentary work and assessed limits such as an inability to sit, stand and walk for an 8-hour day, stating she can lift up to 10 pounds, and she is likely to be absent from work 3 days a month. (Ex. 8F.) On November 21, 2013, Dr. Kim completed a second check box form, this time stating the claimant could not sit, stand and walk for even 2 hours in an 8-hour day, would be absent more than 4 days a month and did not offer any environmental restrictions, but did include additional limits. I accord little weight to Dr. Kim's opinions. Dr. Kim did not support his checkbox form with sufficient objective findings. Dr. Kim's treatment records and the record as a whole do not support such extreme limits. Several other doctors disagree with his assessment. Dr. Kim made inconsistent statements regarding how long he has treated the claimant. Dr. Kim did not sufficiently explain with a narrative the basis for the increased limitations. Dr. Kim did not mention the claimant's asthma or any environmental limits, inconsistent with other doctors' assessments and treatment history. (Exs. 5F, 8F.)

(Doc. 13-3 at 37-38.) Plaintiff contends the ALJ's reasons for giving less than controlling weight to the opinion of Dr. Kim and giving greater weight to the nonexamining and examining physicians warrant reversal. (Doc. 20 at 14-18.)

2. Checkbox form of the opinions

A treating physician's opinion that is "conclusory and brief" and lacks support of clinical findings may be rejected by an ALJ. *Magallanes*, 881 F.2d at 751. Consequently, the Ninth Circuit established that an ALJ may discredit a treating physician's opinion is in the form of a checklist where the opinion is brief lacks supportive objective evidence. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) ("The ALJ permissibly rejected...check-off reports that did not contain any explanation of the bases of their conclusion"); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003) ("treating physicians' views carried only minimal evidentiary weight" when in the form of a checklist and lacking supportive objective evidence).

The ALJ characterized Dr. Kim's medical opinion as merely a "checkbox form" without sufficient objective findings. Though Dr. Kim completed the functional capacity questionnaire in a cursory manner, it was sufficient. Dr. Kim provided his diagnoses of "inflammatory arthritis," and identified elevated sedimentation rate and CRP rates along with fatigue in support. (Doc. 13-13 at 32.) He also identified Plaintiff's high GPR and CRP in his opinion from August 2015. (Doc. 13-15 at 16.) Moreover, Dr. Kim submitted all records consistent with his opinion. In those records, repeatedly, Dr. Kim noted elevated ESR, CRP, and fatigue as indications of chronic inflammatory arthritis. Thus, the record does not support the ALJ's conclusion that the forms completed by Dr. Kim lacked sufficient objective findings.

### 3. Inconsistent statements by Dr. Kim

The Ninth Circuit determined an opinion may be rejected where there are internal inconsistencies within a physician's reports. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 603 (9th Cir. 1999).

As one of her reasons for rejecting Dr. Kim's opinion, the ALJ found that "Dr. Kim made inconsistent statements regarding how long he has treated the claimant." (Doc. 13-3 at 38.) The ALJ noted that Dr. Kim's first functional capacity questionnaire lists the first contact with Plaintiff in 2009. (*Id.* at 32.) The second functional capacity questionnaire identifies the date of first patient contact as "prior to 2011."[1] (Doc. 13-15 at 16.) These statements are not inherently inconsistent, and do not support the ALJ's rejection of Dr. Kim's medical opinions.

To the extent the ALJ believed the "treatment records… do not support such extreme limits," she failed to identify any specific findings in the treatment records that contradict the limitations identified by Dr. Kim. (*See* Doc. 13-3 at 37.) Although the ALJ stated many of Dr. Kim's "exam findings were normal, unremarkable, or not included in his treatment notes," the ALJ fails to identify the specific findings—or why she believed they were "normal"—and to distinguish the negative findings from the positive examination findings. For example, the same date that Dr. Kim completed his second residual functional capacity assessment, he noted Plaintiff had negative findings for several systems, such as her respiratory, cardio, and psych systems. (Doc. 13-8 at 9.) However, Plaintiff had positive musculoskeletal results due to ankle swelling, joint pain, joint swelling, and muscle weakness. (*Id.*)

Significantly, it is error to read a physician's notes "selective[ly]" rather than "in full and in context." *Holohan v. Massanari*, 246 F.3d 1195, 1204-05 (9th Cir. 2001). Thus, the purported inconsistencies with the treatment notes do not support the ALJ's rejection of Dr. Kim's opinions.

### 4. Consistency with the medical record

The Ninth Circuit determined that an ALJ may reject limitations "unsupported by the record as

---

[1] The first record from Dr. Kim in the medical record is dated June 20, 2011, but the record is a summary of the visit and not an initial report. (Doc. 13-10 at 2.) According to the Disability Report, the date of Plaintiff's first visit was January 1, 2009. (Doc. 13-8 at 36.) It is unknown why the first record provided is only from June 20, 2011. It is possible that the Administration only ordered records from 2011 forward given Plaintiff's alleged disability date.

13

a whole." *Mendoza v. Astrue*, 371 Fed. Appx. 829, 831-32 (9th Cir. 2010) (citing *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2003)). When an ALJ believes the treating physician's opinion is unsupported by the objective medical evidence, the ALJ is required to "set[] out a detailed and thorough summary of the facts *and conflicting clinical evidence*, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986) (emphasis added); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct."). For example, an ALJ may also discount the opinion of a treating physician by identifying an examining physician's findings to the contrary and identifying the evidence that supports that finding. *See*, *e.g.*, *Creech v. Colvin*, 612 F. App'x 480, 481 (9th Cir. 2015).

The ALJ also rejected Dr. Kim's opinion because "[s]everal other doctors disagree with his assessment." (Doc. 13-3 at 37.) The ALJ observes that "Dr. Kim did not mention the claimant's asthma or any environmental limits, inconsistent with other doctors' assessments and treatment history." (*Id.*) However, Plaintiff was seeking Dr. Kim's care for her complaints of joint pain and arthritis, not asthma. Dr. Kim is a rheumatologist and was not treating Plaintiff as a general practitioner. His failure to note other conditions unrelated to rheumatoid arthritis is not an inconsistency and Dr. Kim's medical opinion cannot be discredited on this basis. Rather, the ALJ erred by failing to properly consider the specialization of the physician in determining what weight to give that opinion. *Orn v. Astrue*, 495 F.3d 625, 632-33 (9th Cir. 2007).

**B.      Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

14

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834.

Here, the ALJ failed to identity legally sufficient reasons for rejecting the limitations identified by Plaintiff's treating physician, Dr. Kim, and failed to resolve the conflicts in the record regarding Plaintiff's physical limitations. The matter should be remanded for the ALJ to re-evaluate the medical evidence. *See Moisa*, 367 F.3d at 886.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in evaluating the medical evidence, and the administrative decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate on these grounds, it declines to address the remaining issue presented in Plaintiff's opening brief. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Juana Del Carmen Gomez and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **February 22, 2019**     **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE